**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| IN RE: Bill of Lading Transmission and Processing System Patent Litigation. | : | MDL Docket No. 1:09-md-2050 |
| | : | |
| _____ | : | Case No. 1:09-cv-532 |
| | : | Case No. 1:09-cv-179 |
| THIS DOCUMENT APPLIES TO: : | Case No. 1:09-cv-445 | |
| | : | Case No. 1:09-cv-818 |
| R+L Carriers, Inc., | : | Case No. 1:09-cv-472 |
| | : | Case No. 1:09-cv-502 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| Affiliated Computer Services, Inc., | : | |
| DriverTech, LLC, | : | |
| Intermec Technologies Corp., | : | |
| Microdea, Inc., | : | |
| PeopleNetCommunications Corp., and | : | |
| Qualcomm, Inc., | : | |
| | : | |
| Defendants. | : | |

## <u>ORDER ON CLAIM CONSTRUCTION</u>

### <u>Introduction</u>

This a patent infringement case in which Plaintiff R+L Carriers, Inc. alleges that

Defendants Affiliated Computer Services, Inc., DriverTech, LLC, Intermec Technologies

Corp., Microdea, Inc., PeopleNetCommunications Corp., and Qualcomm, Inc. have

induced the infringement of U.S. Patent 6,401,078.  This matter is now before the Court

for claim construction as required by <u>Markman v. Westview Investments</u>, 52 F.3d 967

(1995), <u>aff'd</u>, 517 U.S. 370 (1996).  The parties have filed their respective claim

construction memoranda and on November 12, 2013 the Court held a <u>Markman</u> hearing

during which counsel for the parties presented arguments in support of their respective

constructions of the claims at issue.

## I. The '078 Patent

U.S. Patent 6,401,078 ("the '078 Patent") claims a method for improving the efficiency of operations for less-than-a-load ("LTL") carriers centered on scanning and transmitting bills of lading from the cab of a truck. The sole independent claim of the '078 Patent claims the following method: 1) placing a package on the transporting vehicle; 2) using a portable document scanner to scan an image of the documentation data for the package, said image including shipping details of the package; 3) providing a portable image processor capable of wirelessly transferring the image from the transporting vehicle, 4) wirelessly sending the image to a remote processing center; 5) receiving the image at a remote processing center; and 6) prior to the package being removed from the transporting vehicle, utilizing the documentation data at said remote processing center to prepare a loading manifest which includes said package for further transport of the package on another vehicle. '078 Patent col. 13, ll. 40-48, col. 14, ll. 1-13. The gist of the claimed method is to "automate[] the process of receiving transportation documentation and producing advance loading manifests therefrom to optimize load planning and dynamic product shipment and delivery control." '078 Patent, Abstract.

## II. Claim Construction Principles

In Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005), the Federal Circuit set forth at length the proper claim construction procedure, including proper use of the specification to interpret claims, consideration of the patent's prosecution history, resort to extrinsic evidence, such as expert testimony, treatises, and dictionaries, and

reiterating that there is a line of demarcation between using the specification to interpret the claims and improperly importing limitations into the claims.  The Court will not recite all of those principles here.  Phillips, however, will be the Court's primary authority in this claim construction exercise.

III. The Court's Constructions of the Claims

A. Claims 1, 2, and 6 - "loading manifest"

The sixth step of the claimed method involves using an image of the documentation data at the remote processing center to prepare a "loading manifest" for further shipment of the package. '078 Patent, col. 14, ll .8-12.  Dependent claim 2 teaches combining the documentation data for the package with other packages having similar documentation data in order to create "loading manifests" to optimize the load to be shipped on at least one other transporting vehicle.  Id., col. 14, ll. 13-19.  Dependent claim 6 teaches routing the documentation data received at the remote processing center to an interim destination of the package for utilization in "loading manifests."  Id., col. 14, ll. 29-33.

R+L argues that the Court should give "loading manifest" its plain and ordinary meaning - "a document that identifies the cargo of a vehicle."  Defendants propose that this term means "a document that identifies all packages that must be on another transporting vehicle for further shipment."

A person skilled in the art would understand that a "loading manifest" serves two purposes.  First, it identifies the particular cargo or packages the loading dock workers must load into a specific truck for further shipment.  The specification makes this clear.  For instance, the specification notes that load planning software can "automatically build

3

a shipping and loading plan to minimize partial loads and keep the shipments on time."
'078 Patent, Col. 6, ll.21-23.  The specification also recites that an "advance loading
manifest" "provide[s] instructions to workers at a destination, informing the workers that
a particular package or item needs to be placed on a particular truck for further shipping
at a particular time."  Id. col. 7, ll. 51-53.  Later, the specification states that a loading
manifest is used to "load and unload (as appropriate) the arriving truck."  Id. col. 13, ll.
16-17.  So, again, the loading manifest tells the dock workers which packages must go
on which trucks.

Second, however, a loading manifest also identifies the specific cargo on a
specific truck.  Indeed, logically it must.  Once the workers load each package identified
on the loading manifest onto the truck, the manifest obviously transforms into a
document that identifies all of the packages or cargo on the truck.  This conclusion is
supported by extrinsic evidence as well.  For instance, Black's Law Dictionary defines
"manifest" as a "[d]ocument used in shipping and warehousing containing a list of the
contents, value, origin, carrier and destination of the goods to be shipped or
warehoused."  BLACK'S LAW DICTIONARY 962 (6th ed. 1990) (emphasis added); Altiris,
Inc. v. Symantec Corp., 318 F.3d 1363, 1369 (Fed. Cir. 2003) ("[D]ictionary definitions
may be consulted in establishing a claim term's ordinary meaning.").

Accordingly, the Court concludes that the proper construction of "loading
manifest" incorporates both parties' definitions of the term.  The Court concludes that
the proper meaning of the term "loading manifest" is "a document that both identifies the
cargo of a vehicle and all the packages that must be on another transporting vehicle for
further shipment."

4

Claim 1 - "package"

The goal of the claimed method is to increase the efficiency of shipping "packages."  The parties dispute what "package" means.  Although the specification defines "package" as "any item or cargo to be shipped," '078 Patent, col. 6, ll. 52, Defendants want to add a further limitation that "package" refers only to less-than-a-truckload packages because the claimed method is allegedly limited to less-than-a-load applications.

Generally, however, the preamble and stated purpose of an invention are not limitations on the claimed invention.  Bicon, Inc. v. Straumann Co., 441 F.3d 945, 952 (Fed. Cir. 2006).  Thus, the fact that the specification states that the purpose of the claimed method is to solve shipping problems in the less-than-a-load trucking industry does not compel a conclusion that the claimed method is limited to less-than-a-load packages.  See Boehringer Ingelheim Vet-Medica, Inc. v. Schering-Plough Corp., 320 F.3d 1339, 1345 (Fed Cir. 2003) ("An intended use or purpose usually will not limit the scope of a claim because such statements usually do no more than define a context in which the invention operates.").

Moreover, even if the specification describes only a single embodiment, the claim will not be limited to that embodiment unless the specification indicates that the claim is to be so limited.  Warsaw Orthopedic, Inc. v. Globus Med., Inc., 416 Fed. Appx. 67, 70 (Fed. Cir. 2011).  In this case, the specification of the '078 Patent states that it is not intended to be limited to less-than-a-truckload applications, noting specifically that it might be useful in full load shipments where redirection of the load is required.  '078 Patent col. 13 ll. 24-30.  This statement indicates that R+L did not disclaim use of the

5

claimed method in all but less-than-a-load applications.  See Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 909 (Fed. Cir. 2004) ("Absent a clear disclaimer of particular subject matter, the fact that the inventor may have anticipated that the invention would be used in a particular way does not mean that the scope of the invention is limited to that context.")(internal brackets omitted).

Accordingly the Court concludes that "package" has the meaning given in the specification - "any item or cargo to be shipped."

Claims 1, 5 - "transporting vehicle" and "transportation vehicle"

Claim 1 requires the package to be shipped on a "transporting vehicle." Dependent claim 5 refers to "dynamically updating the documentation data" on the "transportation vehicle."

The parties essentially agree on the meaning of these terms.  Defendants, however, again propose to limit the definition of "transporting vehicle" or "transportation vehicle" to less-than-a-load trucks.  This argument is rejected for the reasons just set forth with regard to the term "package."

Accordingly, the Court concludes that "transporting vehicle" and "transportation vehicle" means "a vehicle upon which a package is placed for transportation."

Claim 1 - "shipping documentation data," "the documentation data," "said documentation data," or "the shipping documentation data"

The parties essentially agree that "shipping documentation data" refers to information about the package being shipped.  R+L proposes a plain and ordinary meaning for this term but proposes an alternative definition that refers to what information "the shipping documentation data" could contain, "such as package

6

identifier, package weight, package dimension, package destination, delivery requirements, or package current location." Defendants, on the other hand, propose that "the shipping documentation data" <u>must</u> include "package identifier, package weight, package dimension, package destination, delivery requirements, <u>and</u> package current location." Defendants also contend that the definition of "shipping documentation data" must make clear that it refers to information in a document that the driver receives from the customer. Defendants argue that the preamble acts as a limitation to this claim term. Hence, Defendants propose that this term means "information in shipping documents received by the driver of a transporting vehicle from a customer including package weight, package dimension, package destination, package delivery requirements, and package current location."

As an initial matter, the Court disagrees that this term includes a limitation that the shipping documentation data must come from a document provided by the customer to the driver. In other words, the claim is broad enough to cover a situation - to give one example - where the customer orally gives the shipping information to the driver, who then enters it into his own standard bill of lading form, and which is then transmitted to the remote processing center. Indeed, the specification indicates that shipping documentation may be "completed by the driver at the time of pickup." '078 Patent, col. 6, ll. 44-45. Moreover, the specification indicates that the driver may supplement the shipping information provided by the customer with other information, such as by making notations on the customer's documentation. <u>Id.</u> col. 8, ll. 29-51, passim. Clearly then, "documentation data" is not limited to just the information provided to the driver by the customer on a shipping document.

7

Moreover, the specification does not indicate that any particular information <u>must</u> be included in the "shipping documentation data." The specification states that the documentation data contains "relevant information . . . <u>such as</u> package weight, package dimension, package destination, package delivery requirements, package current location, etc." '078 Patent, col. 8, ll. 6-9 (emphasis added). By use of the phrase "such as," the specification clearly sets forth only an exemplary list of items that <u>could be</u> included in the shipping documentation data. <u>Catalina Mktg Int'l, Inc. v. Coolsavings.com, Inc.</u>, 289 F.3d 801, 811 (Fed. Cir. 2002) ("'Such as' introduces an example of a broader genus rather than limiting the genus to the exemplary species."). Contrary to Defendants' assertion, this interpretation does not render the claim invalid for indefiniteness because a person skilled in the art would readily understand that the shipping documentation data can include any and all information needed to ship a package from Point A to Point B.

Accordingly, the Court concludes that "shipping documentation data" means "information contained in shipping documents, which may include package identifier, package weight, package dimension, package destination, delivery requirements, or package current location."

<u>Claim 1 - "Wirelessly sending to a remote processing center"</u>

The parties propose similar definitions for this term but R+L contends that Defendants have improperly imported additional limitations into their construction of it. R+L proposes a plain and ordinary definition for this term, or in the alternative, that it means "transmitting without a fixed or hardwire connection (i.e. in the absence of a communications connection using hard wires) to a facility that processes the

8

communication and that is remote or sited away from a transporting vehicle."
Defendants' propose that this term means "transmitting without a fixed or hardwire
connection (i.e. in the absence of a communications connection using hard wires) to a
facility at which the shipping documentation data is wirelessly received, loading planning
information is utilized in response to a request, and advance loading manifests are
prepared." R+L argues that Defendants are adding limitations, most notably what the
remote processing center does with the shipping documentation data, that are
addressed elsewhere in the claims. The Court agrees.

The doctrine of claim differentiation indicates that one claim should not be
construed to render another claim superfluous. Comark Comm., Inc. v. Harris Corp.,
156 F.3d 1182, 1187 (Fed. Cir. 1998). Defendants' proposed definition violates this
principle. Here, the term under consideration addresses how the shipping
documentation data is transmitted to the remote processing center - that is all.
Defendants, however, want to add into the definition of this term what is done with the
data at the remote processing center - receiving the transmission and performing the
steps necessary to prepare a loading manifest. Those functions, however, are
addressed in the two steps that follow this term. '078 Patent, col. 14, ll. 6-12.
Defendants' definition renders superfluous the last two steps of the claimed method,
and therefore, must be rejected.

Defendants also propose that the definition of "wirelessly sending" must exclude
use of cellular communications as a means to transmit the image of the documentation
data to the remote processing center. Defendants first contend that R+L surrendered
cellular communications during the prosecution history of the '078 Patent in order to

overcome the examiner's rejection of the claim as being obvious in view of Caci.
Defendants also contend that "wirelessly" must exclude cellular communications
because the image of the documentation data will travel on a wire to the remote
processing center once the signal from the truck reaches the cell phone tower.  The
Court, however, disagrees with both arguments.

First, the Court concludes that R+L did not surrender cellular phone
communications during the prosecution history of the patent.  It is true, as Defendants
note, that the patent examiner initially rejected claim 1 on the grounds that it would have
been obvious to combine the communications system of Caci with the document
scanning system of Cukor in order to track and plan the routing of packages being
shipped.  See Doc. No. 325-2, at 24.  R+L, however, did not surrender cellular
communications in order to overcome the rejection based on Caci.  R+L, rather,
distinguished Caci from the claimed method on several grounds, most notably that Caci
does not teach imaging documents or preparing loading manifests.  Doc. No. 325-2, at
31-32.  The examiner then allowed claim 1 because the prior art "does not teach using a
portable document scanner on a transporting vehicle to scan the shipping
documentation data for a package, and then sending that data wirelessly to a remote
processing center where the data is used to prepare a loading manifest for further
transport of the package.  Doc. No. 325-2, at 38.  Although R+L admittedly amended
claim 1 from "sending an image" to "wirelessly sending an image," nothing in this
sequence demonstrates an express disclaimer of cellular communications in order to
obtain allowance of the claim.  Epistar Corp. v. International Trade Comm'n, 566 F.3d
1321, 1334 (Fed. Cir. 2009) ("A heavy presumption exists that claim terms carry their

full ordinary and customary meaning, <u>unless it can be shown the patentee expressly relinquished claim scope</u>.") (emphasis added)); <u>Schwing GmbH v. Putzmeister Aktiengesellschaft</u>, 305 F.3d 1318, 1324–25 (Fed. Cir. 2002) ("[P]rosecution history . . . cannot be used to limit the scope of a claim unless the applicant took a position before the PTO that would lead a competitor to believe that the applicant had disavowed coverage of the relevant subject matter.").

Moreover, the specification of the '078 Patent is replete with references to using a cellular system as a communications link between the transporting vehicle and the remote processing center.  Column 4 notes that a portable fax machine can be "connected to a variety of communications systems including but not limited to cellular telephones[.]" '078 Patent, col. 4, ll.12-15.  Later in the same column, the specification states that a cellular telephone is one of several systems that could be used to transmit a signal containing information from the bill of lading.  <u>Id.</u>, col. 4, ll. 49-55.  Still later, the specification indicates that cellular phones are preferred for short (line of sight) distances and indicated for medium (line of sight to 100 miles) distances or even for long distances.  <u>Id.</u>  col. 4, ll. 58-65.  Column 5 again identifies a cell phone system as an appropriate communications system.  <u>Id.</u>, col. 5, ll.30-34.  Column 7 states that an image processor can interface with a transmission device, "such as a cellular modem," to transmit an image of the shipping documentation.  <u>Id.</u> col. 7, ll. 12-14.  These references also indicate that R+L did not surrender cellular communications during the prosecution of the patent.  <u>See</u> <u>Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.</u>, 340 F.3d 1298, 1306 (Fed. Cir. 2003) ("[T]he examination of the written description and drawings is necessary to determine whether the patentee has disclaimed subject

matter or otherwise limited the scope of his claims."); Bowers v. Baystate Tech., Inc.,

320 F.3d 1317, 1328 (Fed. Cir. 2003)("A claim construction that excludes from its scope

a preferred embodiment is rarely, if ever, correct and would require highly persuasive

evidentiary support.")(quoting in part Vitronics Corp. v. Conceptronic, Inc., 90 F.3d

1576, 1583 (Fed. Cir.1996)).

      Since the preferred embodiments indicate that the claimed method can utilize

cellular communications, the foregoing discussion also illustrates that Defendants' literal

construction of "wirelessly sending," in which the image of the documentation data can

never travel through a wire must be rejected.  More reasonably understood, "wirelessly

sending" only requires that the initial transmission of the image of the documentation

data from the transporting vehicle to the communications link occur wirelessly.

Thereafter, the claimed method is indifferent to the means by which the image ultimately

reaches the remote the processing center.  The specification supports this conclusion.

One of the claimed advantages of the patented method is that it liberates the driver from

having to make an interim stop to fax shipping documents to the remote processing

center - the very point that distinguishes the invention from the method taught by Cukor.

See '078 Patent, col. 2, ll. 28-45.  This is also confirmed by Figure 4, which indicates

that the scanning and transmitting of the bills of lading "occur while the driver is on

board the transportation vehicle or while the truck is in transit."  Id. col. 9, ll. 8-10.  In

other words, the point of "wirelessly sending an image to the remote processing center"

is to make the scanning and transmission process portable with the truck and/or driver

and not to avoid having the image ever travel through a wire.  See, e.g., col. 9, ll. 14-17

("The phrase 'on board' is intended to connote the fact that the equipment will travel

with driver and vehicle, and is not limited to any particular location.").

Accordingly, the Court concludes that "wirelessly sending to a remote processing center" means "transmitting without a fixed or hardwire connection (i.e., in the absence of a communications connection using hard wires) to a facility that processes the communication and that is remote or sited away from a transporting vehicle."

Claim 1 - <u>"shipping details of the package"</u>

The second step of the claimed method recites that a portable document scanner will be used to scan an image of the documentation data, "said image including shipping details of the package." '078 Patent, col. 13, ll. 46-47.  The specification states that the documentation data provided by the customer "may be supplemented by the driver with remarks, weather conditions, corrections, additional details, and otherwise updated en route as applicable." '078 Patent, col. 6, ll. 45-48.  Defendants contend that "shipping details of the package" <u>must</u> include this information with every package to be shipped; R+L contends that this information <u>may</u> be included with the package to be shipped.

The parties' dispute over this term is the same as their dispute over what information must be included in "documentation data" and should be resolved the same way.  The specification's use of the word "may" clearly signals an exemplary or non-mandatory list of items that could be included in "the shipping details of the package." BLACK'S LAW DICTIONARY 979 (6th ed. 1990) ("Word 'may' usually is employed to imply permissive, optional, or discretional, and not mandatory action or conduct.").

Accordingly, the Court concludes that "shipping details of the package" means "information about a package, which could include remarks, weather conditions, corrections, and/or error notations."

13

Claim 1 - "Scan an image of the documentation data"

R+L proposes a plain and ordinary definition for this term, i.e., that it means "to convert a document or picture associated with a package into digital form." Stated another way, R+L proposes a common sense definition which indicates that the bill of lading or similar documentation that accompanies the package is converted into a digital form or image.

Defendants, on the other hand, contend that this term cannot be construed and, therefore, is invalid due to indefiniteness. Defendants' position is that because the patent claims use of a portable document scanner "to scan an image of the documentation data," this claim recites a two-step procedure in which an image of the shipping document is created and then the image of the documentation data from the first scan is re-scanned and transmitted. Defendants argue further that R+L is attempting to overcome this "nonsensical" term by eliminating the requirement to "scan an image" and simply equating this term with "scanning the document." Defendants contend, however, that the Court cannot construe the term this way because it would not give effect to "scan an image" and because R+L surrendered the scanning of documents during the prosecution of the '078 Patent.

The Court is not persuaded that R+L surrendered document scanning in the prosecution history of the patent.

In its original application, R+L recited a method in claim 7 which, in pertinent part, required shipping documents to be transmitted by "converting a bill of lading into an electronic bill of lading[.]" Doc. No. 325-25, at 18. The patent examiner rejected claim 7 (as well as Claims 1-4) as being anticipated by the Cukor patent, which disclosed

14

"telefaxing the shipping document from where the shipment is picked up[.]" Doc. No. 325-26, at 3.

R+L then filed a continuation-in-part application in which claim 1 recited the step of "scanning of an image of the documentation data for the package, said image including shipping details of the package[.]" Doc. No. 325-1, at 50.  The patent examiner also rejected this claim as being anticipated by Cukor because Cukor disclosed telefaxing the shipping document at the place where the package is picked up.  Doc. No. 325-2, at 23-24.  In response to the examiner's rejection, R+L amended claim 1 to read, "using a portable document scanner to scan an image of the documentation data for the package, said image including shipping details of the package[.]" Doc. No. 325-2, at 27.  In its remarks to the amendments, R+L conceded that Cukor "does disclose scanning documents," but that it could "find no teaching or suggestion of using a portable document scanner."  Doc. No. 325-2, at 30.  The examiner subsequently allowed this claim, stating in part that "the prior art of record does not show or teach using a portable document scanner on a transporting vehicle to scan the shipping documentation data for a package[.]" Doc. No. 352-2, at 38.

The Court finds that this sequence does not demonstrate that R+L surrendered scanning documents in the prosecution history.  It is accurate that the patent examiner rejected original claim 7 on the grounds that it recited scanning documents.  However, there is no indication that R+L recited "scanning an image of the documentation data" in new claim 1 in order to avoid Cukor's reference to telefaxing shipping documents. Indeed, the examiner initially rejected Claim 1 on the grounds that it was anticipated by Cukor, which strongly suggests that the examiner equated "scanning an image of the

15

documentation data" with "telefaxing the shipping document."  In other words, the patent examiner concluded that "the documentation data" was synonymous with "the shipping document."  Stated another way, the patent examiner essentially concluded that Claim 1 was the same as previously-rejected Claim 7.

The patent examiner, however, ultimately allowed Claim 1 because it was amended to require the use of a portable scanner to scan the documentation data for the package.  Indeed, the patent examiner specifically concluded that the point which distinguished amended Claim 1 from Cukor was the use of a portable document scanner to scan the documentation data.  The amended claim, therefore, was not allowed simply because R+L surrendered scanning and transmitting images of actual documents.  If "documentation data" meant something different from "shipping documents," the patent examiner should have allowed Claim 1 before R+L amended it to include use of a portable document scanner.

Moreover, as R+L correctly argues, the specification of the '078 Patent has numerous references to scanning and transmitting images of actual documents and, thus, supports its definition of this term.  The Summary of the Invention states that "[t]here is a document input system that provides for scanning the paper bill of lading into an electronic data format or electronic bill of lading." '078 Patent, col. 2, ll. 54-57. Figure 1A and the written description of this preferred embodiment state in part that the invention "comprises scanning a document using a scanning/input system[.]" Id., col. 3, ll. 52-53.  Figure 3 is a flow chart depicting the invention.  The specification describing the flow chart states that "[h]aving identified the package and the documentation, the driver loads the package into his truck in step 100 and scans an image of the

16

documentation received creating an electronic representation of the documentation." Id.
col. 6, ll. 66-67, col. 1, ll. 1-2. Regarding Figure 4, another flow chart, the specification
states, "The documentation is scanned into the driver's computing device in step 270."
Id. col. 8, ll. 56-58. In explaining Figure 6, the specification states that "[t]his input
device 600 might preferably include a scanner which electronically converts
transportation documentation into a electronic image." Id. col. 11, ll.18-21. Figure 7
indicates that "transportation documents are sent from the truck[.]" Id. col. 12, l. 50. As
the Court stated earlier, "a claim construction that excludes from its scope a preferred
embodiment is rarely, if ever, correct and would require highly persuasive evidentiary
support."

Defendants also argue that because R+L claimed scanning shipping documents
in subsequent continuation-in-part applications of the '078 Patent, "scanning an image
of the documentation data" must have a meaning different from "scanning a shipping
document." The Court is reminded, however, that the doctrine of claim differentiation is
not absolute and that sometimes "two claims which read differently can cover the same
subject matter." Tandon Corp. v. U.S. Int'l Trade Comm'n, 831 F.2d 1017, 1023 (Fed.
Cir. 1987); see also Kraft Foods, Inc. v. International Trading Co., 203 F.3d 1362, 1368
(Fed. Cir. 2000) ("That the patentee chose several words in drafting a particular
limitation of one claim, but fewer (though similar) words in drafting the corresponding
limitation in another, does not mandate different interpretations of the two limitations,
since defining a state of affairs with multiple terms should help, rather than hinder,
understanding.")(internal quotation marks omitted). Here, the specification indicates
that "documentation data" is synonymous with the bill of lading or the shipping

17

document itself.  Thus, when the invention recites that the step "scans an image of the documentation data," it really means to "scan an image of the shipping document."

The Court, therefore, concludes that to "scan an image of the documentation data" means "to convert a document or picture associated with a package into digital form."

<u>Dependent Claim 2 - "optimize"</u>

Dependent Claim 2 of the '078 Patent continues the method recited in Claim 1 by adding a limitation "further comprising the step of comparing and combining the documentation data received at said remote processing center with similar shipping documentation data of other packages to be delivered from an interim destination and other shipping data, and preparing loading manifests to optimize the loads to be shipped on at least one other transporting vehicle."  '078 Patent. col. 14, ll.13-19. Defendants argue that the term "optimize" is indefinite and cannot be construed as written in the claims.  Defendants contend that "optimize" provides no objective standard to determine when a load to be shipped falls within the scope of the claim. Defendants argue that, as claimed, whether a shipping load has been optimized depends entirely on R+L's subjective opinion.  R+L, on the other hand, proposes the plain and ordinary meaning of ordinary meaning of "optimize" - "to make the best or most effective use of."   R+L also disputes that the term "optimize" is indefinite because it lacks objective standards.  R+L points out the specification indicates that a truck load is optimized when it leaves the terminal fully loaded.

A claim term is indefinite if it fails to "delineate the scope of the invention using language that adequately notifies the public of the patentee's right to exclude."

18

<u>Datamize, Inc. v. Plumtree Software, Inc.</u>, 417 F.3d 1342, 1347 (Fed. Cir. 2005). However, '[o]nly claims not amenable to construction or insolubly ambiguous are indefinite." <u>Id.</u> (internal quotation marks omitted).  A claim will not be indefinite if it can be given any reasonable meaning.  <u>Id.</u>  Defendants are correct that the definition of a term cannot depend on undefined standards or completely subjective opinions.  <u>Id.</u> at 1350, 1352.  Nevertheless, "[i]ntrinsic evidence in the form of the patent specification and the file history should guide a court toward an acceptable claim construction." <u>Id.</u> at 1348.  In this case, the Court concludes that the specification provides a reasonably acceptable objective standard for the term "optimize."

The Background of the Invention and the Summary of the Invention indicate two problems that the claim method is directed to solving - the problems of speeding up the turn around time for packages at the terminal and having delivery trucks leave the terminal only partially loaded.  The Background discussion states that the "goal of load planning is to deliver the freight with the delivery truck leaving the terminal with a full load."  '078 Patent, col. 2, ll.1-3.  The Background also notes that oftentimes, trucks sit at the terminal idling while load-planning functions are being carried out.  <u>Id.</u>, col. 2, ll. 3-6.  Then, there is the problem that freight usually comes to the terminal one truck at a time, and, because it is unknown what each truck is carrying and the destination of its contents, trucks often leave the terminal partially loaded.  <u>Id.</u> col. 2, ll. 6-11.  The Background notes that "[m]any of these trucks could have been fully loaded had the load planner known about unscheduled freight[.]" <u>Id.</u> col. 2, ll.12-14.  The Summary of the Invention states that by employing the claimed method, "fewer delivery trucks will depart with partial loads."  <u>Id.</u> col. 3, ll. 12-13.

Collectively then, the Background of the Invention and the Summary of the Invention teach that a load is "optimized" when the transportation vehicle leaves the terminal with as full a load as possible at the time of departure and that, on an organizational level, load optimization occurs when as few trucks as possible leave the terminal with partial loads.  Thus, the specification provides a reasonably objective standard for "optimize" since one can readily determine when a delivery truck is as fully loaded as it can be at the time of departure and when it is not.

Defendants also argue that this claim is indefinite because a person skilled in the art would have to make individual subjective choices as to when a load is "optimized" in order to avoid infringement.  During the <u>Markman</u> hearing, Defendants noted that a person skilled in the art would have to continually balance between "fully loaded" and "on time" to determine when a load is "optimized."  In the Court's opinion, however, Defendants have set up a false dilemma. The specification indicates that as between "on time" and "fully loaded" a person of ordinary skill in the art of shipping packages will choose to have the transportation vehicle leave "on time" rather than "fully loaded."  The specification states that "[t]he goal of load planning is to deliver the freight on time with the delivery truck leaving the terminal with a full load."  '078 Patent, col. 2, ll. 1-3.  The specification then goes on to explain the problem of trucks leaving the terminal with partial loads.  This indicates to the Court that when faced with the choice, a person skilled in the art will always choose "on time" over 'fully loaded" otherwise there would never be a problem with trucks leaving the terminal partially loaded.

The Court, therefore, accepts R+L's definition of "optimize" - "making the best or most effective use of."

Claim 5 - "dynamically updating the documentation data sent"

Dependent claim 5 of the '078 Patent indicates that the shipping documentation data can be "dynamically updated" while "the transportation vehicle is in transit to provide more current data on the shipping status of the package."  Defendants argue that this term cannot be defined and is invalid as indefinite.  Defendants contend that the specification does not indicate how information about a package can be "dynamically updated."  R+L argues that this term simply means that information about the package can be changed in real time - "changes made to the documentation data in real time."

R+L's definition is supported by the specification.  Specifically, columns 12 and 13 describe how the status and estimated time of arrival of the package can be continuously updated through a remote processor on the truck.  The specification also indicates that the remote processor can be used for location updates.  '078 Patent, col. 7, ll. 66-67, col. 1-3.  Moreover, this claim indicates that its purpose is to dynamically update the transit status of the package rather than to dynamically update the documentation data about the package itself.  Stated in full, the claim recites "dynamically updating the documentation data sent while the transportation vehicle is in transit to provide more current data on the shipping status of the package" (emphasis added). '078 Patent, col. 14 ll. 25-28.  The definition of "dynamic" includes "active" and "characterized by continuous change".  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 711 (1971).  Thus, the '078 Patent's use of the word "dynamically" conveys the concept that information about the package can be actively or continuously changed.  R+L's proposed definition captures this concept as well.

21

Accordingly, the Court concludes that "dynamically updated" means "changes made to the documentation data in real time."


**IT IS SO ORDERED**

Dated: December 31, 2013                    <u>       s/Sandra S. Beckwith       </u>
                                        Sandra S. Beckwith
                                        Senior United States District Judge